UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE


UNITED STATES OF AMERICA                                          PLAINTIFF


v.                                             CRIM. ACTION NO. 3:15-CR-0133- GNS


TOMMY M. SLAUGHTER                                          DEFENDANT


**FINDINGS OF FACT, CONCLUSIONS OF LAW
AND RECOMMENDATION**

**INTRODUCTION**

This motion comes before the Court to consider a motion to suppress evidence filed by

Defendant Tommy M. Slaughter.  (DN 15, Motion to Suppress).  Slaughter is charged by Counts

1 and 2 of a federal indictment with the knowing and intentional possession of both cocaine and

heroin with the intent to distribute the same in violation of 21 USC §§ 841(a)(1) and

841(b)(1)(C).  (DN 1, Indictment, Cts 1 and 2).  Count 3 of the same Indictment charges

Slaughter with the knowing possession of a firearm by a convicted felon in violation of 18 USC

§§922 (g)(1), 924(a)(2) and 924(e). (Id.).

All three charges are the result of a warrantless search and seizure that occurred on the

evening of July 2, 2015 in the Russell neighborhood of Louisville, Kentucky at the intersection

of 19th St. and Main Street.  Louisville Metro Police Department (LMPD) officers on that date

arrested Slaughter, who was sitting next to an open window in the front passenger-side seat of an

automobile stopped at the drive-through window of the West Main Liquor Store. Officers took

1

Slaughter into custody after he allegedly refused to respond to police commands to remove his right hand from his pants pocket, which was discovered to contain a handgun. LMPD officers at the time were investigating a suspected hand-to-hand drug transaction they had just witnessed as they drove by the liquor store. It involved Slaughter and another individual, Scott, who police observed leaning into the open car window next to Slaughter after Scott had just been seen reaching into his pants pocket.  Slaughter was removed from the vehicle and a loaded .22 Beretta handgun taken from his pants pocket.  Officers then performed a pat down search. This warrantless search resulted in the discovery of three bindles found in the same pants pocket as the gun.  Two of the bindles contained crack cocaine and the other heroin.

Slaughter now argues in his motion to suppress that the officers involved in the warrantless search and seizure lacked even reasonable suspicion, much less probable cause, to seize him from the automobile that evening or to search his person after he was forcibly removed.  In his view, no articulable facts supported their belief that a hand-to-hand drug transaction had just transpired immediately before they approached the vehicle.  Consequently, the handgun and the drugs seized from his person were taken pursuant to an unconstitutional warrantless search and seizure that also requires that his post-arrest statements be suppressed. For these reasons he asks that all of these items be suppressed.

## FINDINGS OF FACT

At approximately 10 PM in the evening on July 2, 2015, LMPD officer Jonathan Haywood was traveling in an unmarked Ford Explorer with three other LMPD officers.[1]  All of the four officers were members of "Operations Trust," a violent crimes task force charged with the investigation of street-level drug and firearms crimes occurring in high crimes areas in

---

[1] (DN 22, Official Transcript of Suppression Hearing (TSH), p. 4, 13, 17).

Louisville.[2]  As the unmarked police vehicle traveled southward on 19th St. nearing Main Street Officer Haywood observed to his right what appeared to be a hand-to-hand drug transaction.[3] The transaction occurred at the passenger side of a vehicle that had stopped at the drive-through window of a local liquor store situated at the northwest corner of the intersection.[4]  The vehicle was stationary and faced northbound on 19th St. with the open passenger side window closest to the approaching police vehicle.[5]

As Haywood watched from approximately 30 ft. by the light provided by a corner street lamp, an individual walked up to the open passenger window, reached into his pocket and then leaned into the vehicle.[6]  Detective Tony Benzing also watched as this purported drug transaction occurred.[7]  Neither Haywood nor Benzing, however, could see what the individual, later identified as one Mr. Scott, had in his hand at the time, nor could either officer then see what if anything that Defendant Slaughter may have given to or taken from Scott, if anything.[8] Finally, neither officer knew how long Scott had been standing by the open car window before they arrived on the scene nor did they see him walk up to the window of the car.[9]

Nevertheless, the moment the officers saw what happened they performed an immediate U-turn and pulled alongside the vehicle with the police lights activated on their own car.[10] Detective Benzing, Officer Haywood and a third officer, Detective Manganello, quickly jumped out and approached the vehicle stopped at the drive-thru.[11]  Detective Benzing and Officer Haywood went directly to the open passenger side window. Detective Manganello separately

---

[2]  (TSH, p. 3, 35). Operations Trust became Ninth Mobile and was, prior to that time, known as VIPER. (Id.).
[3]  (TSH, p. 5-6, 36).
[4]  (TSH, p. 5-6, 15-16).
[5]  (TSH, p. 6, 38-39).
[6]  (TSH, p. 16, 18, 28-31, 43-4).
[7]  (TSH, p. 36-37, 43).
[8]  (TSH, p. 28-31, 45).
[9]  (TSH, p. 44).
[10]  (TSH, p. 7, 17-18, 34).
[11]  (Id.).

stopped the suspected drug buyer, Scott, who at that point had stepped back from the vehicle.[12] Detective Benzing asked Defendant Slaughter, who was still seated inside the vehicle immediately next to the open window, to remove his right hand from his pocket, which Benzing could see through the open car window.[13]

Slaughter simply sat there with a blank stare on his face and ignored the officer while making no effort to withdraw his hand.[14]  Instead he appeared to Officer Haywood simply to look over at the female driver of the vehicle with a sad look on his face.[15]  The detective then asked Slaughter two more times to remove his hand from his pocket.[16]  When Slaughter did not comply or even respond, Detective Benzing reached into the vehicle and placed his hand on top of Slaughter's right wrist while Slaughter's hand, remained in the pocket.[17]  Det. Benzing felt the shape of a handgun in the pocket.  He yelled, "Gun!" while taking control of Slaughter's right hand, which Slaughter removed from his pocket at that point.[18]

Officer Haywood and Benzing immediately removed Slaughter from the vehicle.[19] Detective Benzing reached into Slaughter's right pocket at that time and pulled out a fully loaded .22 Beretta handgun.[20]  Officer Haywood then placed Slaughter's hands behind his back while Haywood performed a pat down search of Slaughter.[21] The pat down produced three bindles of drugs from the interior change pocket located within the same pocket where the gun had been

---

[12]  (TSH, p. 7-8).
[13]   (TSH, p. 8, 22, 37-39).
[14]  (TSH, p. 9, 22-23, 26, 42).
[15]  (Id.).
[16]  (TSH, p. 39).
[17]  (TSH, p. 9-10, 23-24, 42).
[18]  (TSH, p. 10, 24, 26-28, 38).
[19]  (Id.).
[20]  (Id., p. 22, 40, 42-43).
[21]  (TSH, p. 10-11, 31, 43).

found and approximately $100.[22] During the search, Slaughter looked over at the female driver of the vehicle and repeated, "Baby, I'm gone. I'm gone."[23]

     An initial pat down search of Scott, however, produced no drugs, until after a drug detection dog arrived at the scene.[24] The dog immediately alerted on Scott, whom the officers searched again without success.[25]  When the dog alerted on Scott a second time, he was asked to remove his shoes. Examination of his shoes by the officers revealed hidden marijuana, although none was found in the automobile, which was also searched following the arrest, or the female driver.[26] Scott was subsequently cited for possession of marijuana.[27] At no time did Scott or Slaughter attempt to flee from the officers as these events unfolded outside the liquor store that evening.[28] No officer testified that he saw Scott reach into his shoe or remove it prior to leaning into the car that evening.[29]

     Officer Haywood recalled that at the time it was growing dark. The area, however, was adequately lit by street lights located there on the corner so that the officers had no problem seeing everything that occurred.[30]  Officer Heywood additionally testified that he was aware of multiple arrests and shootings in the immediate area of the liquor store, which he characterized as being a "high crime" area.[31]

---

[22]  (Id., p.10-11,  22-23, 27, 31-32, 38).
[23]  (TSH, p. 11).
[24]  (TSH, p. 11-12, 18, 20).
[25]  (TSH, p. 12).
[26]  (TSH, p. 19, 21).
[27]  (Id.).
[28]  (TSH, p. 41).
[29]  (TSH, p. 20).
[30]  (TSH, p. 30-31).
[31]  (TSH, p. 30, 33).

## CONCLUSIONS OF LAW

Slaughter argues in his post-hearing brief in support of his motion to suppress that the LMPD officers had no reasonable suspicion to confront him that evening on July 2 as he sat in his girlfriend's vehicle at the drive-thru window of the liquor store.[32]  He asserts that without such a reasonable suspicion, they had no constitutional basis under the Fourth Amendment to seize his hand or his person, or to remove him from his vehicle, merely because officer Haywood had at best an unverified hunch that a drug transaction was going down at the drive-thru. The United States contends that at the moment of seizure, officers Haywood and Benzing had far more than merely in inarticulate hunch of criminal activity given the location of events, along with the combination of Scott's activities at the window of the car, and Slaughter's repeated refusal to respond to officer Benzing's inquiries, or to remove his hand from his right front pocket when requested to do so three times in rapid succession.[33]

The Fourth Amendment principles of search and seizure law that govern investigative stops are well established.  *United States v. Vite-Espinoza*, 342 F.3d 462, 466-67 (6th Cir. 2003) ("The generally applicable principles of search and seizure jurisprudence are well-known and settled.").  A warrantless stop is to be analyzed as an investigative detention under the principles of *Terry v. Ohio*, 392 U.S. at 9.  United States v. Wilson, 506 F.3d 488, 492 (6th Cir. 2007) ("'An ordinary traffic stop is like an investigative detention, the scope of which is governed by *Terry* principles.'") (quoting *United States v. Perez*, 440 F.3d 363, 370 (6th Cir. 2006).  Under *Terry*, a warrantless stop for questioning will be held to be reasonable if "'specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.'").  *Vite-Espinoza*, 343 F.3d at 466 (quoting *Terry*, 392 U.S. at 21-22)).

---

[32] (DN 26, Defendant's  Post-Suppression Hearing Memorandum).
[33] (DN 25, United States Post-Suppression Hearing Brief).

The standard for reasonable suspicion under *Terry* is an objective one. *Id*. It requires that the detaining officers "'have a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *United States v. Johnson*, 620 F.3d 685, 692 (quoting United States v. Cortez, 449 U.S. 411, 417-18 (1981)). In determining whether such reasonable suspicion exists, the reviewing court is to look to the totality of the circumstances in place at the time of the seizure. *United States v. Arvizu*, 534 U.S. 266, 273 (2002); *United States v. McCauley,* 584 F.3d 440, 443 (6th Cir. 2008).

No fact is to be analyzed in isolation. *United States v. Williams*, 615 F.3d 567, 666 (6th Cir. 2010); *United States v. Martin*, 289 F.3d 392, 397 (6th Cir. 2002) ("[C]ourts do not separately scrutinize each factor relied on by the officer conducting the search.") Consequently, a series of acts that independently may appear innocent, when taken together can justify further investigation. *Arvizu*, 534 U.S. at 274.

Officers in conducting such an investigation are fully entitled to rely upon their professional experience and specialized training to draw inferences from and make deductions about the cumulative information available to them, information that might well seem entirely innocuous to the untrained eye. *United States v. Perez*, 440 F.3d 363, 371 (6th Cir. 2006). Among the facts that an officer may fully consider in the totality of the circumstances is the presence of a suspect in an area of expected criminal activity at an unusual hour. Such circumstances by themselves are not sufficient, however, to support a reasonable, particularized suspicion. *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000); *United States v. Blair,* 524 F.3d 740, 750-51 (6th Cir. 2008); *United States v. Caruthers*, 458 F.3d 459, 467-68 (6th Cir. 2006). Nevertheless an officer is not required to ignore the characteristics of a location in determining

whether the circumstances are sufficiently suspicious to warrant further investigation. *Jones,* 673 F.3d at 502(citing *Wardlow,* 528 U.S. at 124).

Other examples of the type of circumstances that the investigating officers may take into consideration are the officers' own direct observations, information received from police dispatch, directions or information from other police officers involved in the investigation, as well as the area and time of day during which the suspicious activities occurred. *United States v. Pearce*, 531 F.3d 374, 380 (6th Cir. 2008); *Dorsey v. Barber*, 517 F.3d 389, 395 (6th Cir. 2008). Observation of an apparent hand-to-hand transaction consistent with drug dealing is considered to be a crucial factor in establishing reasonable suspicion. *United States v. Paulette*, 457 F.3d 601, 606 (6th Cir. 2006). Indeed, such observed transactions are held to be "'highly probative' in evaluating reasonable suspicion." *Williams v United States*, 632 Fed. Appx. 816, 823 (6th Cir. Dec. 3, 2015)(citing *Jones,* 673 F.3d at 502). *See also United States v. Alexander*, 528 Fed. Appx. 515, 519 (6th Cir. 2013). As one district court explained, " when a police officer witnesses a hand-to-hand exchange in an area known for drug transactions, the officer has reasonable suspicion to believe that criminal activity is afoot." *Irvin v. City of Shaker Heights*, 809 F. Supp.2d 719, 730 (N.D Ohio 2011)(citing *United States v. Sweeney*, 402 Fed. Appx. 37 (6th Cir. 2007)).

What is important in this regard is the collective information available to the officers at the time of the warrantless stop itself. *United States v. Torres-Ramos*, 536 F.3d 542, 552 (6th Cir. 2008), *cert. denied, Rahburn v. United States*, 129 S.Ct. 772 (2008); *Feathers v. Aey*, 319 F.3d 843, 848-49 (6th Cir. 2003) (totality of the circumstances involves consideration of "all of the information available to law enforcement officials at the time"). The Court in considering this totality of the circumstances will review the evidence offered in support of reasonable

8

suspicion "using a commonsense approach as understood by those in the field of law enforcement." *United States v. Richardson*, 385 F.3d 625, 630 (6th Cir. 2004) (citing *Cortez*, 449 U.S. at 417-18).

The Government bears the burden to prove by a preponderance of the evidence the existence of a reasonable suspicion to believe, based on objective and articulable facts, that the Defendants were engaged in criminal activity at the time of the warrantless investigative stop. *Torez-Ramos*, 536 F.3d at 552. Certainty of criminal activity need not be shown in order for a suspicion to be objectively reasonable under the Fourth Amendment. *United States v. Flores*, 571 F.3d 541, 545 (6th Cir. 2009) ("law enforcement officers need not have certainty in order for a suspicion to be reasonable"). In fact, the level of suspicion necessary for a warrantless investigative stop is relatively minimal and "considerably less than proof of wrongdoing by a preponderance of the evidence." *United States v. Sokolow*, 490 U.S. 1, 7 (1989). While an inchoate or unparticularized suspicion or hunch will not suffice, so long as articulable facts reasonably suggest that criminal activity "may be afoot," even though the officers involved lack probable cause for the challenged investigatory stop, such stop will be constitutionally reasonably under *Terry*. Id.

Reasonable suspicion is to be determined at the time of the stop. *United States v. Smith*, No. 1:14-cr-232, 2014WL 6617263 at * 3 (N.D. Ohio Nov. 21, 2014)(" It is well settled that "reasonable suspicion is measured at the time of the detention[.]")(quoting *United States v. Jones*, 673 F.3d 497, 501 (6th Cir. 2012)). A suspect will not be "seized" for the purpose of the Fourth Amendment until he or she yields to a show of official authority. *United States v. Martin*, 399 F.3d 750, 752 (6th Cir. 2005)( ("a seizure does not occur when a mere show of authority occurs, but only when one yields to a show of authority"). For example, a stop will occur when

an officer restrains a suspect by use of physical force or by a show of authority that "has in some way restrained the liberty of the citizen." *United States v Jeter*, 721 F.3d 746, 751-52 (6th Cir. 2013). Acts of a defendant that occur *after* he encounters the police, but *before* he is detained, may properly be taken into consideration in the totality of the circumstances to determine if a reasonable suspicion existed at the time of the stop. *See United States v. Seymour*, 739 F.3d 923, 928-29 (6th Cir. 2014); *Smith,* 2014 WL 6617263 at * 4-5 (defendant's subsequent actions that occurred after his initial encounter with police, but before his detention when he attempted to flee, properly could "contribute to a finding that officers had reasonable suspicion to stop defendant.").

The analytical framework of *Terry* requires that courts also address a related question about the degree of intrusion once a suspect has been lawfully stopped. *See, United States v. Campbell*, 549 F.3d 364, 370-72 (6th Cir. 2008). In other words, a lawful *Terry* stop must not only be justified at the point of its inception, but additionally must be "reasonably related in scope to the circumstances which justified the interference in the first place." Id. (citing *Blair*, 524 F.3d at 750). The investigative detention must last no longer nor be more intrusive than is necessary to carry out the purpose of the stop otherwise a temporary investigative stop will become an arrest that must be supported by probable cause. *Dorsey*, 517 F.3d at 398; *United States v. Garcia*, 496 F.3d 495, 504 (6th Cir. 2007). See also, *Torres-Ramos*, 536 F.3d at 551-52 ("If the detention is proper, then the second question is 'whether the degree of intrusion ... was reasonably related in scope to the situation at hand, which is judged by examining the reasonableness of the officers' conduct given their suspicions and surrounding circumstances.") (citing *United States v. Caruthers*, 458 F.3d at 464).

10

Safety concerns are an integral factor in *Terry* stop situations. *Campbell*, 549 F.3d at 371-72. For example, a legitimate concern for officer safety will permit the police to order the driver and passenger out of a stopped vehicle. *Id.* When a reasonable suspicion exists that such individuals may be armed and dangerous, the officer may conduct a pat-down search as well. *Id.* The Supreme Court in fact specifically recognized in *Terry v. Ohio*, 392 U.S. 1, 22 (1968), that, "The policeman making a reasonable investigatory stop should not be denied the opportunity to protect himself from attack by a hostile suspect." *Adams v. Williams*, 407 U.S. 143, 146 (1972).

Consequently, "When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others," he may conduct a limited protective search for concealed weapons so that he may pursue his investigation without fear of violence." *Terry,* 392 U.S. at 24. *See also Adams*, 407 U.S. at 146 ("So long as the officer is entitled to make a forceable stop, and has reason to believe that the suspect is armed and dangerous, he may conduct a weapon search limited in scope to this protective purpose."); *United States v. Foster*, 376 F.3d 577, 586 n. 7 (6th Cir. 2004), *cert. denied*, 543 U.S. 1012 (2004) ("[A]n officer is permitted to conduct 'a reasonable search for weapons for [his or her] protection ... where he [or she] has reason to believe that he [or she] is dealing with an armed and dangerous individual.'").

The Sixth Circuit also has held that officers may draw their weapons and use handcuffs during a *Terry* stop without converting the stop to an arrest as long as the circumstances warrant such precautions for officer safety. *Radvansky v. City of Olmstead Falls*, 395 F.3d 291, 309 (6th Cir. 2005) (citing *Houston v. Clark Co. Sheriff's Deputy John Does* 1 - 5, 174 F.3d 809, 815 (6th Cir. 1999)). The Sixth Circuit has further held in *United States v. Vite-Espinoza*, 342 F.3d 462,

469 (6th Cir. 2003) that "Once having discovered the dropped handgun, the officers would most certainly have been justified in searching everyone present, lest there be another handgun.".

The Sixth Circuit has unequivocally held that "Agents [are] ... entitled to rely on their experience and training in concluding that weapons are frequently used in drug transactions...." *United States v. Heath*, 259 F.3d 522, 530 (6th Cir. 2001). In fact, in both *Bell*, 762 F.2d at 500 and *United States v. Lane*, 909 F.2d 895, 899 (6th Cir. 1990), the Sixth Circuit held that narcotics transactions frequently involve weapons and precautions during *Terry* investigations are reasonably necessary. *See also United States v. Goodwin*, 202 F.3d 270, 2000 WL 64972 at *7 (6th Cir. Jan. 12, 2000) (recognizing the association of drugs and weapons). Accordingly, reasonable precautions for officer safety in such situations have been held to include: (1) drawing of weapons; (2) immediate removal of occupants from the vehicle; and (3) placing the occupants in handcuffs. *See United States v. Marxen*, 410 F.3d 326, 332 (6th Cir. 2005).

The officers involved are likewise permitted to ask the detained individuals a moderate number of questions in order to determine their identity and to confirm or to dispel the officer's reasonable suspicions. *United States v. Butler*, 223 F.3d 368, 374 (6th Cir. 2000). The critical question for this portion of the *Terry* analysis is whether a reasonably prudent officer in the same circumstances would be warranted in believing that his or her safety or that of the public is in danger when the stop actually occurred. *United States v. Campbell*, 486 F.3d 949, 955 (6th Cir. 2007). With these standards in mind, the Court turns to the facts as they existed at the time that evening at 10 pm on July 2, 2015.

Examination of the facts that existed when Detective Benzing first placed his hand on top of Slaughter's right wrist persuades the Court that both LMPD Officers had far more than an inarticulate hunch when they removed Slaughter from the vehicle immediately after Benzing felt

12

a gun in the right pocket of his pants.  Haywood and Benzing had been members of the street crimes unit for several years at that point.  Officer Haywood testified that the Russell neighborhood where the liquor store was located in Louisville was a "high crime area."  Haywood was personally aware that numerous arrests and shootings had occurred in the neighborhood.  It was relatively late in the evening, approximately 10pm, as well.

Both he and Detective Benzing testified that each witnessed what appeared to be a hand-to-hand drug transaction.  Scott was observed reaching into his pants pocket and then leaning into the open, passenger-side window of the car where Slaughter was seated by the window.  The fact that neither LMPD officer then could see exactly what Scott had in his hand, or what Slaughter then may have, or not have, handed to Scott is not determinative.  Certainty, or even probable cause, is not required for a *Terry* stop and search.  The direct observation of what reasonably appeared to be a hand-to-hand drug transaction conducted a mere 30 feet from where the officers were situated in the unmarked Ford Explorer traveling southbound on 19th St. is, of itself, sufficient to establish reasonable suspicion for a *Terry* stop.

When one adds into the mix Slaughter's ongoing refusal to acknowledge Det. Benzing, or to respond to the detective's repeated commands to remove his hand from his pocket, it becomes clear that at that point both officers involved had articulable facts that a drug-related crime was in progress so as to justify Det. Benzing taking control of Slaughter's hand, forcibly removing him from the vehicle, disarming him while Det. Haywood conducting an immediate pat down search for additional weapons or drugs on his person.  Reasonable suspicion of drug trafficking and officer safety readily justified these actions, which at that point were also entirely reasonable in both their scope and their intrusiveness.  This conclusion is repeated confirmed by the above-cited decisions such as *Campbell, Marxen*, *Foster, Vite-Espinoza, Heath*, *Bell*, and *Lane*.

13

Whether such events might or might not have played out in similar fashion in other, more affluent areas of Jefferson County is irrelevant to the Fourth Amendment analysis.  Slaughter does not specifically allege that either Dets. Benzing or Haywood were engaged in unlawful, selective enforcement of the law based on Slaughter's race or his financial status in the community;[34] nor is it relevant that other individuals in wealthier areas, populated by the racial majority, might themselves potentially be subject to prosecution for drug offenses if their personal property or residence were to be searched at some unknown date in the future.[35] Those facts simply are not before us, and Slaughter cites no case law involving such hypothetical scenarios that would entitle him to relief on his current motion.

## RECOMMENDATION

The Magistrate Judge, having made findings of fact and conclusions of law, hereby recommends that the motion to suppress be denied in its entirety for the reasons set forth herein.

---

[34] Such a claim of selective enforcement would require Slaughter to show both a discriminatory purpose and effect for and from the challenged police conduct. *Gardenhire v. Schubert*, 2005 F.3d 303, 318-319 (6th Cir. 2000)(" [I]f the defendant can prove that the prosecutor or investigator intentionally singled him out for punishment because of membership in a protected group or the exercise of a constitutionally protected right[,]" then the Court may dismiss the prosecution or take other appropriate action.)(quoting *Futernick v. Sumpter Township*, 78 F.3d 1051, 1056 (6th Cir. 1996). Slaughter has not come close to making such an evidentiary showing. Indeed, he has not attempted, other than by inferential argument, to make such an equal protection claim. Accordingly, we reject it summarily.

[35] "There is no right under the Constitution to have the law go unenforced against you, even if you are the first person against whom it is enforced, and even if you think (or can prove) that you are not as culpable as some others who have gone unpunished. The law does not need to be enforced everywhere to be legitimately enforced somewhere; and prosecutors have broad discretion in deciding whom to prosecute." *See, Futernick v. Sumpter Township*, 78 F.3d 1051, 1056 (6th Cir. 1996) (citing *Wayte v. United States*, 470 U.S. 598, 607 (1985)), *cert denied*, 519 U.S. 928(1996*). See Heaton v. City of Princeton*, 47 F. Supp2d 841, 843-44 (W.D. Ky. 1997), *aff'd*, 178 F.3d 1294, (6th Cir. 1999)(discussing *Futernick*).

14

## <u>NOTICE</u>

Within fourteen (14) days after being served a copy of these proposed Findings and Recommendation, any party who wishes to object must file and serve written objections or further appeal is waived.  *Thomas v. Arn,* 474 U.S. 140, 150-51 (1985); 28 U.S.C. § 636(b)(1)(c); Fed. R. Crim. P. 59(b)(2); Fed. R. Civ. P. 72(b)

Copies to Counsel of Record

15